Filed 9/10/21  In re Jaylah B. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JAYLAH B. et al., Persons Coming Under the Juvenile Court Law. | B310922 (Los Angeles County Super. Ct. No. 20CCJP05815A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.D., Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Principal Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

Plaintiff and respondent Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition on behalf of Jaylah B. (Jay, born Nov. 2012), Freddie B., IV (Freddie, born Apr. 2015), and Jal.B. (Jal, born Feb. 2017), pursuant to subdivisions (a), (b), and (j). At the combined jurisdiction/disposition hearing, the juvenile court sustained all but one count. It declared the children dependents of the court and removed them from parental custody.

The children's mother, S.D. (mother), timely appealed the juvenile court's jurisdictional findings and dispositional order. She argues that the findings and order are not supported by substantial evidence. We are not convinced. Accordingly, we affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention Report (Nov. 3, 2020)*

Instant referral[2]

In October 2020,[3] DCFS received a referral alleging that mother had shoplifted while the children were with her.

Initial investigation

On October 6, social worker Rori Austin (CSW Austin) arrived at the address listed on the referral to investigate the allegations. She was greeted by a woman who identified herself as the children's maternal aunt (the aunt). The aunt stated that mother and the children did not live there; rather, the family resided at a motel in Lakewood. The aunt stated that she did not have mother's telephone number. When asked if she had any concerns for mother and the children, the aunt stated that the children seemed like they were not being supervised well and she had been told that mother sometimes slept while the children played inside and outside the motel room. The aunt reported that the children had hygiene issues, and she suspected that mother had substance abuse issues.

As CSW Austin was standing at the door speaking to the aunt, a woman walked up and identified herself as the children's maternal grandmother, Regina W. (Regina). Regina stated that she had concerns for the children because mother did not seem to be providing appropriate supervision for the children. Regina added that mother had a DCFS referral in the past that alleged

---

[2]     This was not the first referral to DCFS. The prior referrals were closed as inconclusive.

[3]     All relevant events occurred in 2020 unless otherwise indicated.

3

lack of supervision with mother sleeping while the children went in and out of the motel room.  Furthermore, Regina reported that she was told by a family member that they had used drugs with mother in the past.  Regina was aware that mother physically disciplined the children as Freddie often reported she did.  Regina found the situation to be really sad because she hated seeing her grandchildren living the way they were.  When asked about basic needs, Regina stated that mother always had groceries and she would cook, and that the main concern was hygiene.  The children were often seen dirty and the girls' hair was hardly ever combed.  Regina provided a telephone number for mother.  Regina indicated that mother sometimes would not allow the children to be interviewed alone, and that Freddie was the most open.

Regina reported that mother allowed Freddie B. III (father), the children's father, to see the children inconsistently.  In addition, mother had allowed the children to stay with Regina for a while and she thought it was working well.  Regina stated that when the children lived with her, the aunt helped the children sign into their Zoom classes every day, and Jay had caught up on all of her missing assignments.  Regina stated that father called her while the children were there and would visit them.  However, when mother found out father was visiting the children, she got upset, took the children from Regina's home, and stated that she did not want father to see them.

CSW Austin contacted the motel where mother was reported to be staying and a woman at the front desk confirmed that mother had been staying at the motel for 10 months.

DCFS visits the family at the motel

On October 14, CSW Austin and Intern Salas (Intern Salas) arrived at the motel and were greeted by Jal. The motel room door was open, and CSW Austin could make out the faces and shapes of the children through a screen door. Jal was dressed only in grey panties, and it was clear that she had wet herself. Mother was speaking on her phone. CSW Austin identified herself and stated the purpose for the visit. Mother expressed her displeasure and continued speaking on the phone. Although CSW Austin could not see mother, she could be overheard on the telephone speaking to someone about not feeling well and needing to go to a hospital.

The children walked over to the door to look at CSW Austin. Freddie was dressed only in dirty blue boxer briefs; it looked like he had been wearing them for several days. Jay was dressed in tights and a dirty T-shirt. The girls' hair was disheveled.

Eventually mother came to the screen door and stepped outside to speak to CSW Austin. Mother allowed Intern Salas to interview the children privately inside the motel room while mother spoke with CSW Austin outside.

*Motel room assessment*

Mother later consented to CSW Austin completing a home assessment. The motel room consisted of one bedroom, with two beds, and one bathroom. Freddie and Jay shared one bed, while mother and Jal shared the other bed. The room was dirty, disheveled, and had a strong foul odor. When asked about the smell, the mother attributed it to a turtle, which was in an open bucket in the back of the motel room. CSW Austin observed broken furniture, dirty dishes, and various items out of place

throughout the room.  The bathroom door was off its hinges and the front door of the motel room had been damaged to the point where it could not be locked.  The floor was extremely stained.  The room had one couch that was covered with stains.  The bathroom was dirty and had a number of items on the countertops.  The mattresses and bed coverings were significantly stained.  While the utilities in the room were in working order, the room did not have gas.  Mother had a large hot plate plugged in with an old pan with grease and old fries in it.  CSW Austin observed food in the home as well as snacks and juices stored underneath a table.

Other than the motel room's condition, there were no immediate safety threats such as debris, drug paraphernalia, or weapons, and there was no pool on the property.  Although the room was not infested with bugs, mother reported she had begun seeing cockroaches.

*Interview with mother*

Regarding her arrest for shoplifting, mother denied the allegations.  She claimed that she was treated unfairly and poorly by the store and the police officers.

Mother denied using any form of physical discipline on the children and said that she talks to them and takes away their electronics.  She denied drug use and admitted occasional alcohol use.

CSW Austin explained that because of prior concerns for substance abuse, she wanted mother to drug test.  Mother stated that she drug tested during her last investigation, and she was tired of having to do things because people made false allegations against her.

Mother reported that the children were enrolled at Lewis Elementary School, but refused to attend virtual classes and she did not have time to sit with them during the classes. She stated that Freddie did not know how to write his name. CSW Austin asked mother if she had reached out to the school to express her difficulties and concerns to see if they could help. Mother indicated that she had reached out multiple times via e-mail. CSW Austin expressed that the children were required to be in school and that not logging on was an issue and could cause the children to fall behind. Mother stated that she was looking into home schooling.

*Interview with the children*

Intern Salas interviewed the children together as it was not possible to separate them in the one room. The two older children (Jay and Freddie) were able to differentiate between a truth and a lie. Regarding the allegations, Jay and Freddie stated that they were at Walmart shopping for groceries. Freddie added that the store employees claimed that the basket full of food was a "'go-back'" basket. Jay stated that mother got upset because she had paid for the groceries. Freddie stated that the employees called the police and they waited outside with mother and the police for Regina to pick them up.

Freddie added that mother was mad and used bad words, so the police officers handcuffed her. He did not remember anything else, but denied they stole from Walmart.

When asked how mother disciplined them, Jay and Freddie stated that their mother "'whoops'" them with a wooden backscratcher and her belt, yells at them, and sometimes does not feed them. Freddie picked up the belt and the backscratcher to show Intern Salas what mother used to discipline him and his

7

siblings.  Freddie stated that mother hit Jay the most.  When asked what they usually got in trouble for, the children said for "'pouring seasonings out, jumping on the bed, and making messes.'"

Intern Salas asked Freddie how father disciplined them and was told that father choked them every day.  Freddie said that father would put his hands around his neck, lift him up, and put him up against the wall.  The children expressed being fearful of their parents when they thought they were in trouble.

When asked if they were hungry and if there was food to eat in the room, the children stated yes and that mother cooked every day.  Freddie could not remember what they had for dinner the previous night, but remembered that Jay did not eat because she got in trouble with mother.

Freddie said that mother drank "'adult juice'" every day and explained that "'adult juice'" was wine.  The children said that father used drugs and acted "funny," meaning he walked funny, used bad words, and would hit, choke, and yell at them.  The children stated that mother would sometimes sleep and not wake up until late in the day.  Freddie and Jay also stated that mother said "'ugly bad words'" when the children got in trouble.  Freddie added that mother often called the police on father because he showed up to the room drunk.  Freddie had seen father the previous day.  Jay and Freddie denied having clean clothes to wear.  The children stated that they often wore the same clothes, and that if Jal soiled herself mother would not change her or wash her clothes.

CSW Austin reported that she had arrived at the motel room at approximately 3:00 p.m. and the children had not eaten all day.  The children repeatedly asked mother if they could have

8

snacks and mother would respond by asking if they had cleaned up. At one point, Jay stated that she was going to get juice and a snack. She knew she would get in trouble for it, but she was thirsty. Freddie appeared to be afraid. Jay handed Freddie a snack as well and, appearing fearful, Freddie went to the door to make sure mother was not coming.

When asked if they ever felt sad, Freddie stated he felt sad when his mother or father gave him a "'whooping'" and when his father "'choke[d]'" him. They also felt scared when the police showed up to their room.

CSW Austin reported that the children did not appear to be healthy or well cared for. They were inappropriately dressed. CSW Austin did not observe any visible marks or bruises on the children indicative of abuse or neglect. However, the children said they would sustain marks on their arms and hands from getting hit by mother, but the marks had gone away.

*Interview with motel owner*

CSW Austin and Intern Salas also interviewed Bindu, the owner of the motel. She stated that she had been interviewed during the last DCFS referral and nothing had changed. Mother had been living in the motel for 10 months and had not paid rent since June 2020. Mother also had severely damaged the room. One time, Bindu went to see the condition of the room. It was filthy: the carpet and beds were filthy; the bathroom door and front door were broken; and the room smelled so badly, she almost vomited.

Regarding the children, Bindu stated that the children were up all hours of the night and morning. She had seen the children going in and out of the room as late as 2:00 a.m. She stated that mother would hang out with her friends in front of

9

her motel room drinking and talking loudly.  Bindu was unaware if mother used drugs.  She reported that the children were always dressed in only underwear and were often dirty.  Jal wore only a diaper or sometimes just underwear.

Bindu stated that she had seen who she believed to be father a few times at the motel and he was intoxicated.  She had seen mother hit the children.  At this time, Bindu pulled up her text messages to the previous CSW and stated that after the social worker came out the children were clean and had clothes on for a little while, but things eventually returned to normal.

CSW Austin went through the text messages and found several videos that supported Bindu's statements.  Some of the videos showed mother and other adults standing outside the motel room talking while the children came in and out of the motel room.  Other videos showed the children were dressed only in underwear, and mother did not appear to be watching them.  There were three videos that CSW Austin viewed that caused her concern.  One showed mother pull Jay out of a car by one arm and begin hitting the child's back, arm, and head.  The child dropped to the ground and mother continued hitting her.  Jay stood and tried to run away from mother, and mother hit her one last time in the head before the child successfully fled.  Jay hid in the shadows near a vending machine while mother watched the child while swinging her arms back and forth, waiting for the child to emerge from her hiding place.

The second video showed mother smoking and Jal playing outside in a one-piece T-shirt.  Freddie was sitting by the door when mother walked up to him and began hitting him as he cowered down in the corner.  Mother then resumed smoking her cigarette.

The third video showed father rocking back and forth while trying to hold on to the wall. Father was unsteady on his feet, and he appeared to be intoxicated. Father then unzipped his pants and began urinating on the bushes in front of mother's motel room. The children were running around playing in the video. At one point, Jal walked over to father and looked to see what he was doing. Father swatted at the child apparently to prevent her from seeing his private areas. Father then braced himself on the wall and staggered back into the motel room.

*Regina picks up the children*

CSW Austin contacted Regina to verify that she had picked the children up. Regina confirmed that the children were in her care. Regina stated that mother called her and asked her to pick up the children because she was not feeling well and believed she might need to go to the emergency room. Regina stated that the children told her a social worker had come to their home today. Regina reported that the children were hungry when she brought them to her home at 6:30 p.m., and they told her that they had not eaten all day. Regina confirmed that the children were unclean and had a foul odor.

<u>CSW Austin speaks to CSW Cupp</u>

CSW Austin spoke with CSW Cupp, regarding her prior contact with the family. CSW Cupp stated that during her investigation, mother's room was not clean but not necessarily dirty. She stated that the room smelled of the food mother had cooked in the room. CSW Cupp described the children as hyperactive and stated that she was unable to interview them. She had been out to visit the children two or three times and they did not disclose abuse.

11

CSW Cupp stated that mother left father because of his drinking and other issues. She recalled a video of father being at the room, however, mother reported that this was a one-time occurrence. As far as she could recall, neither mother nor father completed an on demand drug test. CSW Austin asked about the physical discipline, and CSW Cupp stated that she had seen the videos and addressed it with the mother.

Telephone interview with the children's paternal grandmother

On October 15, CSW Austin searched through the family's referral history and located a previous telephone number for father. A woman answered the phone and identified herself as the children's paternal grandmother. The paternal grandmother stated that father was not home. CSW Austin asked how the children got to her home when they visited, and she responded that father picked them up and brought them to her home where they stayed for the weekend.

When asked if she had any concerns for the children, the paternal grandmother initially stated "'no.'" However, after a few minutes, she asked if her statements could be kept confidential. She then stated that she had a lot of concerns. The children went to her home almost every weekend. They would be unkempt and the girls' hair would be extremely matted. She had spoken to father about this, and she knew that he had spoken to mother about it. The paternal grandmother was aware that mother had hit the children, yelled at them, and called them bad names. She had witnessed mother hit Jay in the face. She believed that mother was depressed and that both parents would benefit from classes on how to care for a child with special needs.

12

When asked if father was an alcoholic, the paternal grandmother stated "'yes.'" She stated that she was a recovering alcoholic and had tried to help father, but he denied having a problem with alcohol. The paternal grandmother stated that sometimes father began drinking before 6:00 a.m.

CSW's Austin's further contact with mother

On October 15 and 16, CSW Austin attempted to contact mother to discuss her concerns; she left messages, but mother did not return her calls. On October 21, CSW Austin telephoned mother again to discuss the status of the referral. Mother responded via text message, stated that her voice was gone, and asked if they could converse by text messages. CSW Austin agreed and outlined the concerns. Mother responded that the social worker only saw the children one time and they were perfectly fine and always clean. Mother refused to drug test because she was tired of being pushed around and forced to do something for someone else and she did not use drugs.

According to mother, father did not reside with her and she had nothing to do with him. CSW Austin further explained her concerns, and mother then telephoned the social worker and stated that she did not feel the situation was fair. Mother stated that CSW Austin had talked to people who had not seen her children and did not like her. Mother stated that whoever said she hit her children was lying. Mother stated "'I am so much bigger than my kids. What do I look like hitting them?'"

Mother said that the children went to daycare every day and that CSW Austin should speak to Martha Villa-Lobos (Villa-Lobos).

<u>Interview with the childcare provider</u>

On October 20, CSW Austin contacted Villa-Lobos. Villa-Lobos stated that she was the childcare provider for the children. She had been watching the children since Freddie was about five months old. Villa-Lobos stated that she watched the children almost every day; however, there were days that mother did not bring them. Villa-Lobos added that the children were always clean and well cared for; she denied having any concerns for the children. If there were something going on at home, she believed that the children would tell her, especially Freddie.

<u>Interview with father</u>

On October 21, 2020, CSW Austin received a call from father. He was aware of the incident that led to the DCFS referral as mother had called him. He stated that mother had no need to steal because she received food stamps and whatever else she needed he was willing to provide her. While there was a period when mother was not allowing him access to the children, recently mother had been permitting him to pick the children up for weekend visits. Father said he was not currently with mother and the children.

When asked if he had any concerns for the condition of the motel room and/or the children's hygiene, he chuckled and stated "'the kids don't stink to me.'" Father stated that Jay's and Jal's hair was sometimes not combed. Regarding the condition of the motel room, he stated, "'I have seen the room like that. But if I come and it's like that I clean [it] up. I do not like to be around a lot of mess and she knows that.'"

Father acknowledged that he drank alcohol, but denied having a problem with alcohol. That said, he admitted that he had gone to mother's motel room intoxicated.

When asked how he disciplined the children, father stated that he talked to them and if that did not work he "'pops them on their legs with his hand.'" He denied ever choking the children, and he did not know why Freddie had reported that.

CSW Austin explained her concerns of general neglect. Father stated that he understood but did not want the children to go into foster care. Father provided a telephone number for the children's paternal grandfather to assess him for placement. Father suggested Regina as well and stated that mother had her number.

Removal order

On October 27, the juvenile court issued an order authorizing DCFS to remove the children from mother and father (removal order).

Execution of the removal order

The same day, social workers went to the motel to execute the removal order. Upon arrival, one of the social workers observed father standing outside of the motel room speaking on a phone. The social worker identified herself and attempted to speak to him, but father continued his phone call and did not address the social worker. At this time, Jal came outside and stood next to her father and Jay stood at the screen door. Jal was dressed in a T-shirt and spider man boxer briefs. The child's hair was uncombed and her shirt was dirty. Jay asked if the social worker wanted to speak to mother. When the social worker responded that she did, the child called out to her mother and stated that "'the social worker is here.'" Mother opened the blinds to the motel room window and peered out at the social worker. Mother was sitting up in bed.

While standing at the door waiting on mother, the social workers could see into the room. The room appeared to be in the same condition as when CSW Austin had previously been there, and there were wine bottles on the counters. Mother then stepped outside of the room while the children stood behind her.

One of the social workers informed mother of the removal order and the need to remove the children. Mother loudly stated "'nope'" and then asked where the children were going. The social worker informed mother that the children would be placed with Regina. Mother again stated "'nope, that['s] not going to happen,'" adding "'you may as well go ahead and call the police because I'm not giving you my kids.'" The social worker attempted to hand mother the signed removal order as well as a resource packet with a list of recommended services. Mother stated, "'I'm not taking shit bitch.'" Mother then became aggressive and belligerent. The social worker stepped away from the room to request law enforcement's assistance. Mother yelled at the social worker, "'I'm ready to die behind my kids bitch.'" Mother continued to make aggressive comments, stating "'I should beat your ass'" and "'I should break every window out of your car.'" As the social workers waited in their car for law enforcement to arrive, mother circled the car continuing to curse and threaten them, stating "'I'm coming for everything you got bitch. I'm going to make you lose your job and by the time I'm done with the judge you will not have anything.'"

Mother called out two of her friends in the motel, a man and a woman, to assist her. Mother told them that the social workers were taking the children. She repeatedly stated "'get out of the car bitch.'"

The children came out of the room several times to see what was going on. They would run around outside the motel room for a few minutes each time before mother would yell for them to get back inside the motel room. Mother called someone on the phone and told them to come to the motel because DCFS was there.

When law enforcement arrived, the social workers departed the car to speak to the police officers. Mother and the unidentified male friend approached the officers and the social workers. Mother again started to say that she should bust out the windows of the car, and told the officers that the social workers were there to remove the children. Mother stated that CSW Austin had "'only been on the job for one month and want[ed] to make a good impression.'" Mother refused to accept the removal order or the resource packet from the police officer. Mother sat on the ground in front of the social workers' car and began beating on her chest saying, "'I am a momma, not a mother but a momma.'" Mother then got up and tried to walk around the officers to get to CSW Austin. She was yelling to the male friend and the officer to let her go. The police officer called for backup and another officer arrived.

It appeared that mother might have known the other officer from prior encounters because she calmed down when speaking to him. Mother told the officer that the children would not be getting into the social workers' car and that Regina could take the children. Regina arrived at the scene and attempted to calm mother down. Regina then ushered the children inside the motel room. CSW Austin informed the officers that it was okay for Regina to take the children as this was where the children were being placed. The officers asked the social workers to

17

return to the car for their safety while Regina got the children. Mother walked past the social workers a last time and stated "'watch bitch, wait until they leave.'" She then stated "'you think this is over?'"

Thereafter, mother calmly spoke to her children and the officer that arrived as backup. She asked if he had stickers that he could give to the children.

<u>CSW Austin visits the children at Regina's home</u>

Later that evening, CSW Austin went to Regina's home to review and sign placement paperwork and to speak with the children. When the social worker entered the home, the children were getting out of the bath tub. Regina expressed that the children had a strong odor so she showered them and put their clothes in the washer. The social worker spoke to the children and notified them of the upcoming hearing. Freddie asked when he was going home. CSW Austin explained that he would be with his grandmother until a decision could be reached on when he could return to mother. All three children verbally responded that they were okay with staying with Regina at her home.

<u>Further contact with mother and father</u>

On October 28, CSW Austin sent mother a text message to inform her that her visits could be arranged through the social worker and advised her to enroll in services if possible. Mother responded that she would no longer be speaking to the social worker and only wanted to speak to her supervisor.

On October 28, CSW Austin received a call from father, who wanted to know why the social worker arrived "'at that time of night.'" While they were discussing the upcoming court hearing, mother began using a lot of profanity in the background. CSW Austin ended the phone call with father. CSW Austin then

18

sent a follow up text message to both mother and father providing them with her supervisor's telephone number and advising them to contact her supervisor regarding visitation.

*Section 300 Petition*

On October 29, DCFS filed a petition on behalf of the children pursuant to section 300. Under counts a-1, b-2, and j-1, the petition alleged that mother physically abused Freddie "by striking the child's body with a wooden back scratcher and belt" and that he "sustained marks" on his arms and hands. "Such physical abuse was excessive and caused . . . Freddie . . . unreasonable pain and suffering," endangering him and his sisters, Jay and Jal, at risk of serious physical harm and abuse.

Under counts a-2, b-3, and j-2, the petition alleged that mother physically abused Jay "by striking [her] with a wooden back scratcher and belt . . . . On a prior occasion, the child sustained marks on the arms and hands from getting struck by the mother. On a prior occasion, the mother pulled the child out of the car, struck the child in the head, back and arm, and the child dropped to the ground and the mother continued to strike the child. . . . Such physical abuse was excessive and caused [Jay] unreasonable pain and suffering," endangering her health and well-being and placed her siblings at risk of serious physical harm and abuse.

Under counts a-3 and b-5, the petition alleged that father physically abused the children.

Under count b-1, the petition alleged that mother placed the children in a detrimental and dangerous situation when she shoplifted on October 1.

Finally, under count b-4, the petition alleged that father abused alcohol, rendering him unable to care for the young

19

children; that mother knew of father's substance abuse; and that mother failed to protect the children by allowing father unlimited access to the children and their home.

*Detention Hearing (Nov. 3, 2020)*

At the detention hearing, the juvenile court found a prima facie case for detaining the children from their parents. It ordered monitored visits for the parents. A jurisdiction hearing was set.

*Jurisdiction/Disposition Report (Jan. 7, 2021)*

Interview with Freddie

Freddie said that when he got in trouble, "'I get a whoop[ing] (hit) with nothing and sometimes a whopping with something. Sometimes with a back scratcher . . . and sometimes a belt and sometimes she hits me with it and I cry and my face would get red and tears would be coming up out on my ears.'" Freddie said he would get hit with an open hand and with objects on different parts of his body including his buttocks, back, legs, and arms and his sisters were disciplined in the same manner. Freddie said father did not discipline him. He added that he missed his parents and loved them "'forever forever.'"

Interview with mother

*Physical abuse allegations*

Regarding the physical abuse allegations, mother stated that neither she nor the children owned belts, and she did not hit the children. Mother explained that because she was big and the children were tiny, she did not have to hit them with objects. Nine out of 10 times when she told the children to do something, they did it. The one time they did not do what she told them to do, she would hit them on the hand or finger. Mother claimed that she did not strike the children.

20

Regarding the allegations of mother pulling Jay out of the car, mother stated, "'We were in the car and she reached up and hit me and I don't tolerate that with my kids and I did get upset and I never stood over her and hit her. I did pop her in the car and brought her in the room.'" Mother explained that Jay "'[was] a big girl[, did not] cry, [did not] like [being] pinched[,] and some kids are ticklish and I will pinch her and that is how I get her to listen.'" Mother did not remember striking Jay, but if Jay said she did, she would "'own it and accept and change and . . . learn from it.'"

Mother added, "'I don't want you to think I beat my kids and they don't go past my thigh and my kids are not scared of me. When you beat your child and there is a sudden move, they are scared and frail and any movement jumpy and they are not like that.'" Mother said all she had to do to punish the children was take away their iPad. Mother denied that when she pinched the children it ever left a mark or bruise on them.

Mother denied hitting the children with a backscratcher or a belt. She said that if she were hitting the children, they would have marks and bruises and the two times social workers made the children strip down, they never found any marks or bruises.

The dependency investigator asked mother what she meant by "pop" when she said she has popped Jay. Mother replied that while in the car, Jay hit mother in the face, so she "'popped'" the child on her thigh. Jay then jumped out on her own and ran into her room. The investigator again asked mother to describe what "'pop'" means, and mother stated, "'I don't smack my kids, I might have had a reaction before [I] realized what happened, I didn't smack her I just popped her on the inner thigh. With an open hand, I popped her leg. I don't know how to explain, I just tap

her leg. She never cries she doesn't cry for anything and that comes with her disability and she doesn't cry unless she is having a meltdown or episode and she has no sense of pain or fear, that all had to be in September (2020).'"

Mother stated that it would be no problem for her to change the way she disciplined the children and that she was working on it. She felt the children were prematurely removed from her, but accepted that fact and was working to get them back. She realized the motel was not an ideal situation but stated that it was safe. She did not mind owning up to doing something wrong and accepting help. She just wanted the children returned.

*Allegations of father's physical abuse*

Regarding the allegations that father physically abused Freddie, mother stated, "'So with Freddie, that was an incident and [I] don't know why they keep referring to children and it was my son and that was one time he (father) showed up intoxicated and he grabbed my son by the neck. This was in February (2020) and he did that and I called the police on him and made [a] police report and I tried to get him arrested and they just told him to leave and he came back twice or so and I called the police again. That was the last time he saw my kids until like October or September (2020)." Father said Freddie had slapped Jal. Mother observed father grab Freddie by the neck with his hand, pick the child up off the floor, and hold him against a wall for two seconds. Mother stated that she grabbed Freddie from father and called the police. She tried to get him arrested, but the police only made him leave. Ten minutes later, he returned, so she locked her door and called the police again. The police came and talked to him. While the police were there, she left to pick up her

22

daughter and when she returned father was gone.  Mother said that after that incident she stopped communicating with father.

*Allegation of shoplifting*

Mother again denied shoplifting from Walmart.

*Allegations of father's alcohol abuse*

Regarding the allegations of father's alcohol abuse, mother stated that she did not allow the children to be around him because of his substance abuse.  She started to notice father's drinking towards the end of their relationship a couple years earlier, and his drinking got worse after he was laid off from work.  Mother said that father would drink whatever he could afford and whatever he could get his hands on.  When bills were not getting paid and their car got repossessed, she realized that his drinking was an issue.

When she and father broke up, father went to live with the paternal grandmother and when he would visit the children, mother would know if he had been drinking or not.  If she noticed that he had been drinking, she would not let him see the children.  When father was sober, she would go to Regina's home, and father would stay with them for a few days to see the children.  She would then return to the motel with the children.  However, after the incident where father choked Freddie, she cut off all contact with him.  Mother believed father would benefit from a substance abuse program.

<u>Interview with father</u>

Father reported that when he and mother were together, they did not use physical discipline.  However, he then stated that he would "'pop'" them on the hand, but it was nothing.  Father said that by "'pop,'" he meant a gentle slap with the back of his hand.

Father denied that the choking incident ever occurred.  Rather, Freddie said something crazy to him so he picked the child up by his armpits and threw him on the bed to talk to him.  Father said Freddie was frightened, but did not cry.  He said that the other children were there and they were laughing; they thought he was playing with Freddie.  He denied that he grabbed Freddie hard or threw him on the bed hard.  He said Freddie was not injured.  Father denied doing anything similar to the girls.  And, father denied that he had been drinking that day.

Father did not believe that mother had shoplifted because she received food stamps and he would provide money if she needed it.  He did believe she was struggling financially.

Regarding the allegations of his alcohol abuse, father denied that he drank a lot.  He only drank four to five times a week; beer or liquor depending on how he was feeling.  Father denied ever becoming intoxicated or that the children had ever seen him drink alcohol.  He admitted that the children were sometimes around when he drank, but they would be in another room or he would go outside.  According to father, the paternal grandmother watched the children when he drank during visitation, and he did not drink when he had to drive the children, or he would take a Lyft if he had to.

Father did not believe he had an alcohol problem.  However, when asked about his earlier statement that he

believed he was an alcoholic, he stated alcoholism ran on both sides of his family. He then again stated he believed he was an alcoholic. Father said he began drinking more after the children were detained. Father denied his drinking was the reason he and mother broke up. He wanted to attend a substance abuse program, most likely an inpatient program.

Interview with Regina

Regina said that when mother and the children were living with her, mother would yell at the children a lot and she would give them a "'whooping.'" She explained that "'whooping'" meant an open hand on the children's buttocks, legs, or arms without leaving marks or bruising. The children would cry for a minute at most. When asked about Freddie's claim mother hit him and his sisters with a backscratcher and a belt, Regina said that mother had asked her for her belt but she told mother her belt was not a "'whopping belt.'" Regina could not say mother had not found her belt and used it to discipline the children when she was not present.

She had seen the wooden backscratcher, but had not seen mother use it to punish the children. She had heard Freddie tell a social worker that he would get his "'butt whooped.'"

Regarding the allegations of father's alcohol abuse, Regina stated that she did not have much information regarding father. However, she was aware that father's coworkers had told him that he was smelling of liquor while at work.

Reasonable efforts to prevent removal

The jurisdiction/disposition report indicates that DCFS maintained monthly contact with the family; obtained the necessary police reports; submitted a referral for the children to be seen by HUB; provided a referral packet to mother; held a

Child and Family Teams (CFT) meeting and developed a safety plan; referred Regina's home for resource family approval (RFA); and referred the children for a multidisciplinary assessment team (MAT) assessment.

DCFS recommendations

DCFS recommended that the juvenile court sustain the dependency petition, declare the children dependents, remove them from parental custody, and order supervised visits and family reunification services.

*Interim Review Report (Feb. 2, 2021)*

DCFS reported that mother was attending parenting classes, anger management sessions, and individual counseling. Mother's therapist informed DCFS that he would provide a progress letter when he obtained permission from his supervisor. Mother stated that she had done everything the juvenile court had asked her to do and was ready to have the children returned. DCFS continued to recommend juvenile court jurisdiction, family reunification services, and monitored visits.

*Jurisdiction Hearing (Feb. 2, 2021)*

At the onset of the hearing, the juvenile court admitted into evidence three DCFS reports. It also admitted mother's Exhibit A and a progress letter for individual counseling, anger management, and parenting from Single Parents of Power Counseling Agency, dated January 21, 2021.

Mother's Exhibit A provided the following: "[Mother] enrolled into Single Parents of Power Counseling Agency on December 19, 2020. Her court mandates are Individual Counseling, Parenting, and Anger Management. [Mother] is scheduled for sessions 3 times a week and is seen for one hour each time. Client has completed 12 sessions, 4 of each service, as

of 1/21/21.  [¶]  In counseling sessions, [mother] is engaged and attends regularly.  [Mother] communicates with the therapist when there is a sudden change in schedule.  Client will receive a letter of completion once she is done with Individual Counseling, Parenting, and Anger Management.  [¶]  If any further information is required, please call our administrative office. . . .”

After the evidence was admitted, the juvenile court entertained oral argument.  DCFS argued that the juvenile court should sustain the dependency petition as pled.  The children’s attorney argued that mother’s arrest for shoplifting did not pose a current risk to the children.  She submitted on the counts pled under section 300, subdivision (j), without argument, and argued that the juvenile court should sustain the remainder of the petition.

Mother’s attorney argued that the juvenile court should find credible mother’s denial that she hit the children with a wooden backscratcher or belt.  Alternatively, counsel argued that if the court found that mother’s denials lacked credibility, it should find that mother’s use of the backscratcher and belt were acceptable forms of parental discipline.  She asked the juvenile court to strike her from counts a-3 and b-5 (father’s physical abuse of Freddie), but agreed that the remaining counts were true.  Regarding count b-4 (father’s alcohol abuse), mother’s attorney argued the evidence did not support the allegation that mother failed to protect the children.

Father’s attorney asked the juvenile court to dismiss counts a-3 and b-5 (father’s physical abuse of Freddie) and argued that father’s hitting Freddie on the leg was an appropriate form of discipline and that the choking incident was a one-time event.

27

He argued that the evidence did not support count b-4 (father's alcohol abuse) and asked the court to dismiss it.

The juvenile court noted that it was the first time the court had a child pick up the objects mother struck him with and state, "'Oh, yeah, this is what mom uses.'" It further commented: "So these are the things that you can't use anymore. You want to discipline, you need to know appropriate ways to discipline. This isn't it."

The juvenile court dismissed count b-1 (mother's arrest for shoplifting) and sustained the remainder of the dependency petition.

*Disposition Hearing (Feb. 2, 2021)*

Mother testified. She stated that she found the provider of one of her programs, Single Parents of Power Counseling Agency, on the internet. She denied that DCFS had provided her with referrals. After a discussion of the relevance of such evidence, mother moved on to testify that from her parenting classes, she learned to not get overwhelmed, to not hit the children with objects as a form of discipline, and to ask for help when needed. Instead of using physical punishment in the future, she intended to take away electronics and use timeouts.

Mother stated that in her anger management classes, she learned to control her anger. She then denied that there was any anger to control. Rather, it was more a case of being overwhelmed than angry.

Following mother's testimony, her attorney asked the juvenile court to return the children to mother's custody because she had completed her programs. The juvenile court interrupted counsel by noting mother had not completed anything, and she had attended only four sessions of each one of the programs and,

28

therefore, was in the beginning stages of her programs. Counsel argued mother's Exhibit A showed she engaged in programs. She was learning the effects of physical discipline. Mother's attorney argued that this showed her willingness and desire to reunify with her children. Counsel also argued that had DCFS helped mother get into programs earlier, she would have been farther along; however, even though mother was in the early stages of her programs, she had learned a lot and had testified to the insight she had gained.

If the juvenile court were not inclined to return the children, mother wanted unmonitored visits.

Ultimately, the juvenile court found, by clear and convincing evidence, that there was a substantial danger to the children's physical and mental well-being, reasonable efforts had been made to prevent removal, and there was no reasonable means to protect the children without removal. It removed the children from parental custody and ordered DCFS to provide family reunification services and monitored visits. The juvenile court ordered mother to complete an anger management program and a 26-week parenting program, and to participate in individual counseling.[4]

---

[4] The court ordered case plan indicates that the juvenile court ordered mother to complete a six-month drug program with random and on-demand drug tests and it does not include the order for an anger management program. "Conflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.)

*Notice of Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings and dispositional order for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B.*, *supra*, at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellant, mother must establish that the challenged rulings are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

That said, "when a heightened standard of proof applied before the trial court, an appropriate adjustment must be made to appellate review for sufficiency of the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing

evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Id.* at p. 1005.)  In other words, "the clear and convincing standard of proof [has an] effect on appellate review for sufficiency of the evidence." (*Id.* at p. 1010.)

II.  *Jurisdiction*

Mother argues that the juvenile court erred in assuming jurisdiction over the children because there is insufficient evidence to support the sustained counts.[5]

A.  <u>Applicable law</u>

Section 300, subdivision (a), authorizes dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . .  For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)  Striking a child with an open hand or fist, causing bruises, constitutes serious physical harm within the meaning of section 300, subdivision (a).  (See *In re Veronica G.* (2007) 157 Cal.App.4th 179, 185–186.)  Even evidence of a single

---

[5]     We reach the merits of mother's argument without addressing DCFS's contention that mother's challenge is not justiciable.

incident of physical harm to a child is sufficient for the juvenile court to assume jurisdiction under this provision.  (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.)

Although "'a parent has a right to reasonably discipline'" their child and to "'administer reasonable punishment'" (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 86), whether a parent acts within or outside the bounds of this right turns on "(1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'  [Citations.]"  (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)  "Small children are not to be hit with hard objects, especially to the point of leaving black and blue bruises."  (*In re A.E.* (2008) 168 Cal.App.4th 1, 4; see also *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1472 [father's deliberate and frequent pinching of his son's arms and stomach leaving bruises and his "cavalier indifference toward the infliction of physical pain on [his son]" was sufficient to sustain jurisdiction.)

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."  (§ 300, subd. (b)(1).)  Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness."  (*In re*

32

*Rocco M.* (1991) 1 Cal.App.4th 814, 820, disapproved in part on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 629.) "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1396.)

"[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Section 300, subdivision (j), authorizes dependency jurisdiction over a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

B. <u>Analysis</u>

    1. *Physical abuse*

The juvenile court's jurisdictional findings (counts a-1, a-2, b-2, b-3, & j-1) are supported by ample evidence. The juvenile court found credible the evidence that mother used a wooden

backscratcher and a belt to discipline her children.  Under no circumstances would the use of those objects on her children be an acceptable form of physical discipline.[6]  While the children may or may not have suffered bruises as a result of mother hitting them with these objects, the juvenile court did not have to wait until they suffered a more serious injury before exercising jurisdiction over them.  (See *In re N.M.* (2011) 197 Cal.App.4th 159, 165 ["The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"].)

Urging us to reverse, mother argues that the juvenile court erred in not considering whether her striking the children with a wooden backscratcher and a belt fell within or outside her right to discipline her children.  We are not convinced.  First, as noted above, mother's counsel asked the juvenile court to believe mother's denial of the allegation that she ever struck her children with an object.  And, counsel further argued that if the juvenile

---

[6]     We note that at the onset of DCFS involvement and at the proceedings below, mother denied hitting her children with any object.  On appeal, she now claims that using those objects on her children was her "parenting style."  Aside from our concern about mother's vacillation between denying such conduct and then claiming it to be her parenting style (*In re A.E., supra,* 168 Cal.App.4th at p. 4), we could dismiss mother's contention for the sole reason that she changed her theory of the case.  (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 ["It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried.  Stated otherwise, a litigant may not change his or her position on appeal and assert a new theory.  To permit this change in strategy would be unfair to the trial court and the opposing litigant"].)

34

court did not believe mother, then it should find that the conduct constituted reasonable discipline. By sustaining this count of the section 300 petition, we presume that the juvenile court considered, and rejected, mother's reasonable discipline argument.

In any event, mother offers no evidence or argument in support of her claim that striking her children with a backscratcher and a belt was genuinely disciplinary and warranted under the circumstances. (*In re D.M., supra,* 242 Cal.App.4th at p. 641.) Nor could she. Even assuming she was using those objects to discipline her children, Freddie and Jay stated that mother punished them with the backscratcher and belt when they got in trouble, such as when they "pour[ed] seasonings out, jump[ed] on the bed, and [made] messes" and that her conduct left marks on their arms and hands. Striking children for this sort of behavior is not warranted under any circumstances.

Moreover, the evidence supports the juvenile court's finding that mother's conduct placed the children at serious risk of physical harm. Freddie and Jay told DCFS that they were left with marks on their bodies when mother struck them. Given mother's claim on appeal that this is her parenting style, there is reason for us to believe that she will continue to use objects to strike her children, placing them at serious risk of physical harm.

Thus, the evidence supports the juvenile court's exercise of jurisdiction over both children as alleged in counts a-1, a-2, b-2, b-3, and j-1. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1525, overruled in part by *Conservatorship of O.B., supra,* 9 Cal.5th at p. 1010, fn. 7 [when reviewing the sufficiency of the evidence, we must consider all the evidence "'in [a] light most favorable to the

prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order'"].)

> 2. *Father's alcohol abuse and mother's failure to protect*

Substantial evidence also supports the juvenile court's finding that father's alcohol abuse placed the children at risk of harm and mother failed to protect her children from father's alcohol abuse, as alleged in count b-4. It is undisputed that father had a substance abuse problem. It is also undisputed that the children are of tender years. Father's substance abuse is prima facie evidence of his inability to provide care for his children and place the children at risk. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216; *In re Drake M.* (2012) 211 Cal.App.4th 754, 766.)

There is also substantial evidence that mother failed to protect the children from father's substance abuse issues. Father admitted that he consumed alcohol when the children were present. Freddie and Jay stated that father would walk funny, use bad words, and hit, choke, and yell at them when he was intoxicated. Mother even admitted that father was intoxicated when he choked Freddie. And the motel owner had video of father intoxicated while he was with his family at the motel. This evidence supports the juvenile court's finding that mother failed to protect the children from father's substance abuse issues.

III. *Disposition*

    A. <u>Applicable law</u>

"Our society does recognize an 'essential' and 'basic' presumptive right to retain the care, custody, management, and companionship of *one's own child*, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) "The Juvenile Court Law restricts judicial power to remove a child from the care and society of even an abusive or abuse-tolerant parent. [Citations.]" (*In re Kieshia E.*, *supra*, at p. 77.)

The decision to remove a child from parental custody is only authorized when a juvenile court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re H.E.* (2008) 169 Cal.App.4th 710, 718.) The focus of the statute is on averting harm to the child. (*In re Alexzander C., supra*, 18 Cal.App.5th at p. 451.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.

37

[Citations.]" (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

B. <u>Analysis</u>

Applying these legal principles under the appropriate standard of review, we conclude that the removal order is supported by substantial evidence. As set forth above, there is ample evidence to support the challenged jurisdictional findings. Moreover, there is also sufficient evidence to support the unchallenged jurisdictional findings, namely that mother struck Freddie while he cowered in a corner and that mother pulled Jay out of the car and struck her, continuing even after the child dropped to the ground.

Urging us to reverse, mother contends that the juvenile court erred when it found that DCFS "made reasonable efforts to prevent removal but there are no services available to prevent further detention." Mother seems to have confused a "reasonable efforts" finding, which the juvenile court must make at the disposition hearing, and a "reasonable services" finding, which the juvenile court makes at status review hearings.

The "reasonable efforts" finding focuses on the efforts made to prevent removal at the disposition hearing. (§ 361, subd. (e); *In re Cole C.* (2009) 174 Cal.App.4th 900, 909.) The efforts DCFS made to prevent removal included monthly contact with the children and the parents; obtaining the necessary police reports; submitting a referral for the children to be seen by the HUB; providing a services referral packet to mother; holding a CFT meeting and developing a safety plan; referring Regina's home for a resource family assessment; and referring the children for MAT assessments. These efforts were reasonable. The question of

whether DCFS offers mother reasonable reunification services will arise at the status review hearings.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
HOFFSTADT